**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
TRENTON DIVISION**

| | | |
|---|---|---|
| **JOHN DOE**, by and through JACK DOE and JANE DOE, **JACK DOE**, individually and on behalf of his son, JOHN DOE, **JANE DOE**, individually and on behalf of her son JOHN DOE, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 3:13-cv-06629-FLW-LHG |
| v. | ) | |
| | ) | |
| **CHRISTOPHER J. CHRISTIE**, Governor of the State of New Jersey, in his official capacity, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A
PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS**

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………...……ii

TABLE OF AUTHORITIES………………………………………………………....iii

INTRODUCTION………………………………………………………………1

ARGUMENT…………………………………………………………………...2

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS……………………2

   A.   A3371 Violates Plaintiffs' First Amendment Right to Receive Information…3

      1.   A3371 regulates speech, not conduct. …………………………………3

      2.   A3371 unconstitutionally discriminates on the basis of viewpoint……5

      3.   A3371 is subject to strict scrutiny as a content-based restriction on speech. ………………………………………………………7

         a.   A3371 is not justified by a compelling interest…………………8

         b.   A3371 is not narrowly tailored……..……………………..10

      4.   Even if A3371 regulates conduct, it is subject to intermediate scrutiny under *United States v. O'Brien*, which it cannot survive……………..11

         a.   A3371 does not advance an important government interest…15

         b.   A3371 is targeted at the expression of SOCE counselors…….16

   B.   A3371 Violates Plaintiffs' Free Exercise Rights. ………………………17

      1.   Facial neutrality does not protect A3371 from strict scrutiny……….17

      2.   A3371 is also subject to strict scrutiny because it places a substantial burden on Plaintiffs' religious beliefs. ………………………………...19

      3.   A3371 is subject to strict scrutiny because it is not neutral or generally applicable. ……………………………………………..21

      4.   A3371 fails strict scrutiny. ……………………………………………24

         a.   A3371 is not justified by a compelling government interest…24

      **b.**    **A3371 is not narrowly tailored. ………………………………24**

   **C.**   **A3371 Violates Plaintiffs' Parental Rights. …………………………25**

       **1.**    **A3371 is not justified by a compelling interest…………………………27**

       **2.**    **A3371 is not narrowly tailored. ……………………………………28**

**II.**    **PLAINTIFFS ARE CURRENTLY SUFFERING IRREPARABLE INJURY……..29**

**III.**   **THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFFS' FAVOR. ………………………………………………31**

**IV.**   **THE INJUNCTION WILL SERVE THE PUBLIC INTEREST……………………32**

**CONCLUSION…………………………………………………………32**

## TABLE OF AUTHORITIES

*ACLU v. Reno*, 217 F.3d 162 (3d Cir. 2000)……………………………..………………...32

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) …………………………………………11

*Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991) …………………..……………………14

*Bartnicki v. Vopper*, 220 F.3d 109 (3d Cir. 1999) …………………..……………………11

*Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) …………………..…………24

*Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729 (2011)………………………………….8

*Butler v. Michigan*, 352 U.S. 380 (1957) …………………………………………………29

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir.1983) …………………..………………………29

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)………18, 19, 21

*City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ……………………….6

*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) ……………………..……...11

*Cunningham v. New Jersey*, 452 F. Supp. 2d 591 (D.N.J. 2006). ……………..…………...13

*Deibler v. City of Rehoboth Beach*, 790 F.2d 328 (3d Cir. 1986) ……………………..……...26

*Elrod v. Burns*, 427 U.S. 347 (1976) …………………..………………………………29, 32

*Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466 (9th Cir.1984) ……………………..………29

*Gruenke v. Seip*, 225 F.3d 290 (3d Cir. 2000) ……………………..…………………………..27

*Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995)……14

*Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989) ……………………..………………………....29, 30

*Johnson v. City & Cnty. of Philadelphia*, 665 F.3d 486 (3d Cir. 2011)………………………..10

*King et al. v. Christie et al.*, No. 13-5038, 2013 WL 5970343 (D.N.J. Nov. 8, 2013)…….*passim*

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)…………………..6

*Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,*
510 F.3d 253 (3d Cir. 2007) ……………………..…………………………………...……22

*Lowe v. SEC*, 472 U.S. 181 (1985) ……………………..…………………………………..4

*Members of City Council of City of L.A. v. Taxpayers for Vincent,*
466 U.S. 789 (1984) …………………………………………………………..…………10

*Pierce v. Soc'y of Sisters*, 268 U.S. 510 (1925) ………………………..……………………27

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ………………………..…………………….25

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992). ………………………..………………7, 28

*Reagan v. Time, Inc.*, 468 U.S. 641 (1984) ………………………..…………………………8

*Reno v. Flores*, 507 U.S. 292 (1993) ………………………..………………………………26

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S 115 (1989) ……………………25, 28, 29

*Scheidermann v. I.N.S.*, 83 F.3d 1517 (3d Cir. 1996) ………………………..……………….4

*Sherbert v. Verner*, 374 U.S. 398 (1963) ………………………..……………………………20

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
502 U.S. 105 (1991) ………………………..………………………..…………………8

*Spence v. Washington*, 418 U.S. 405 (2002) ………………………..……………………...13

*Stilp v. Contino*, 743 F. Supp. 2d 460 (M.D. Penn. 2010) ………………..………………32

*Swartzwelder v. McNeilly*, 297 F.3d 228 (3d Cir. 2002) ………..……..………29, 30, 31, 32

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144 (3d Cir. 2002) ……………....11, 13

*Thomas v. Collins*, 323 U.S. 516 (1945) …………………..…………………………………….20

*Troxel v. Granville*, 530 U.S. 57 (2000) …………………………………………………………25

*Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994) ……………….…..……………9, 24, 27

*United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365 (1988)…………..4

*United States v. O'Brien*, 391 U.S. 367 (1968). ……………………..…………………………..15

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000) ……………………………9, 27

*Washington v. Glucksberg*, 521 U.S. 702 (1997) …………………….…………………………...26

*Washington v. Klem*, 497 F.3d 272 (3d Cir. 2007) …………………….……………………20

*West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ………...…………..…9, 10, 27, 29

*Wilson v. N.J. State Police*, No. 04-1523 (MLC), 2006 WL 2358349,
(D.N.J. Aug. 15, 2006) ………………….…………………………………………..…………...13

**Statutes**

N.J.S.A. §45:1-54…………………..…………………………………………..………………..30

N.J. Stat. Ann. § 45:1-55…………………….…..………………………………….……*passim*

**Other**
*Webster's II New College Dictionary* 263 (3d ed. 2005) ……………………..………………5, 22

Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (2009), *available at* http://www.apa.org/pi/lgbt/resources/therapeutic-response. pdf. …………………..………………………………….…………………………*passim*

American Association of Christian Counselors (Dec. 10, 2013), http://www.aacc.net/about-us/…………9

Chris Christie Signs Ban on Gay 'Conversion Therapy,' Politico.com (Aug. 19, 2013), *available at* www.politico.com/story/2013/08/chris-christie-gay-conversion-therapy-new-jersey 95666.html………17

Matt Barber, 'Gay' Lawmaker to Christians, We'll Take Your Children, OneNewsNow (Aug. 26, 2013), available at www.onenewsnow.com/perspectives/matt-barber/2013/08/26/'gay'-lawmaker-to-christians-'we'll-take-your-children' ……………………….………………………………………..…………17

Haldeman, D., *When sexual and religious orientation collide: Considerations for psychotherapy with conflicted gay men*, The Counseling Psychologist, 32(5) (2004)…………………………..18

Drescher, J., "Queer Diagnoses: Parallels and Contrasts in the History of Homosexuality, Gender Variance, and the Diagnostic and Statistical Manual," Arch. Sex. Behav. (2010).................18

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

COME NOW Plaintiffs, by and through counsel, and file this Memorandum in Support of their Motion for a Preliminary Injunction and in Opposition to Defendants' Motion to Dismiss.

## INTRODUCTION

On November 11, 2013, Plaintiffs John Doe, by and through his parents, Jack Doe and Jane Doe, both individually and on behalf of John Doe, filed their Complaint challenging New Jersey Statute § 45:1-55 (hereinafter "A3371")[1] as a violation of their First Amendment right to receive information and as a violation of their First Amendment right to the free exercise of religion, their hybrid rights under both the First and Fourteenth Amendments, and their Fourteenth Amendment right to direct the upbringing and education of their child. (Dkt. 1, Compl. ¶¶ 120-67). A3371 prohibits licensed mental health counselors from providing and minor clients from receiving sexual orientation change efforts ("SOCE") counseling. Plaintiffs also filed a Motion for Preliminary Injunction seeking to enjoin Defendant Governor Christie from enforcing A3371 in any manner that violates Plaintiffs' constitutional rights. (Dkt. 4).

On November 18, 2013, Garden State Equality ("GSE") filed its motion to intervene, which alleged that its participation was necessary to protect its interests as the primary sponsor of the legislation, its alleged expertise in the "consensus" surrounding sexual orientation change efforts ("SOCE") counseling, and to provide alternative viewpoints concerning Plaintiffs' claims. (Dkt. 9-2, Intervention Brief of GSE at 1-2). On December 6, 2013, without leave of this Court or any authority upon which to file the numerous pleadings it submitted, GSE filed numerous and voluminous documents including a Motion to Dismiss, Response to Plaintiffs' Motion for

---

[1] For ease of identification, when discussing the law generically Plaintiffs will use the bill number, A3371, and will use the codified sections when directly citing the statute.

Preliminary Injunction, several lengthy declarations, and frivolous and irrelevant objections to Plaintiffs' submitted material. (*See* Dkt. 17 to 17-11).[2] This Court has not ruled on GSE's motion to intervene, so all of the materials submitted are not properly before this Court. Plaintiffs therefore object to GSE's filings in their entirety and move that they be stricken from the record and that their motion to intervene be denied.[3]

On December 6, 2013, Defendants submitted a combined Motion to Dismiss/Opposition to Plaintiffs' Motion for a Preliminary Injunction. (Dkt. 18 to 18-3, "Def. Response"). Defendants' Response is premised entirely on the false assumption that Plaintiffs have no constitutional injury because their licensed mental health counselors are not engaging in any speech whatsoever (Def. Response at 12-14). They also argue that Plaintiffs do not seek nor do their counselors provide counseling with any communicative elements that Plaintiffs expect to receive from their counseling (*id*. at 18), that Plaintiffs cannot assert a free exercise violation because the statute is facially neutral and contains no exemptions (*id*. at 23-25), and that Plaintiffs' parental rights claims are invalid. (*Id*. at 29-31). Defendants' arguments are flawed, this Court should revisit its previous positions on A3371, and should grant Plaintiffs' Motion.

## ARGUMENT

## I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

A3371 violates Plaintiffs' First Amendment right to receive information because it suppresses the speech of all New Jersey licensed mental health counselors solely on the basis of

---

[2] Notably, GSE submitted 392 pages worth of materials, many of which are irrelevant. This is further evidence that GSE's Motion to Intervene should be denied as unduly prejudicial and burdensome to Plaintiffs. Plaintiffs' objections to GSE's intervention are more fully set forth in their opposition the GSE's Motion to Intervene. (Dkt. 16).

[3] Should this Court grant GSE's Motion to Intervene, Plaintiffs' Reply Memorandum in Support of their Motion for Preliminary Injunction addresses all of the arguments raised in GSE's filed materials, as they are virtually identical to Defendant's Motion to Dismiss/Opposition to Plaintiffs' Motion for Preliminary Injunction (*See* Dkt. 18-1).

the viewpoint and content of their counseling and does so without adequate justification. Nevertheless, even if a licensed mental health counselor's counseling with his clients is considered only conduct, which it should not be, then it is certainly expressive conduct and is subject at least to intermediate scrutiny. Additionally, A3371 violates Plaintiffs' free exercise rights by restricting the counseling that they can seek and receive based solely on a disagreement with the message, while carving out exemptions for virtually identical counseling in a slightly different context. In fact, the Act explicitly defines SOCE to **include** efforts to change "gender identity, or gender expressions," but then excludes those very same counseling efforts when they are directed toward one "seeking to transition from one gender to another." Finally, A3371 is a gross intrusion into the fundamental rights of parents to direct the upbringing of their children absent expansive government intrusion. The preliminary injunction should issue.

### A.    A3371 Violates Plaintiffs' First Amendment Right to Receive Information.

### 1.    A3371 regulates speech, not conduct.

While this Court previously addressed this issue by looking to the statutory definition of the practice of psychotherapy, that analysis ignores many of the regulations cited. *See King et al. v. Christie et al.*, No. 13-5038, 2013 WL 5970343, *12 (D.N.J. Nov. 8, 2013) (citing N.J. Stat. Ann. § 45:14B-2). This Court's analysis focused on the first few words of the definition but overlooked the language those terms were modifying. Defendants' entire argument against Plaintiffs' First Amendment claims here also hinges on this Court's analysis of the definition of psychological services. (Def. Response at 13-14). As this Court correctly noted, New Jersey defines the "rendering of psychological services" as "the application of psychological principles and procedures in the **assessment**, **counseling** or **psychotherapy** of individuals." *Id*. (emphasis added). This Court focused on the precatory words of the statute while overlooking the operative

words of the definition. In fact, this Court stated that the definition of psychotherapy hinges entirely on the "application of principles and procedures," and that the other words included in the definition were "immaterial." *Id*. "Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." *United Savings Ass'n v. Timbers of Inwood Forest Assoc*., *Ltd*., 484 U.S. 365, 371 (1988).

Here, when read as a whole, the operative words of the definition of the "rendering of psychological services" reveal why this Court's analysis in *King* was too narrow. It is the "application of principles and procedures" in the **assessment**, in the **counseling**, and in the **psychotherapy** that licensed professionals engage in with their clients. This definition recognizes that there are differences in the services rendered by mental health professionals, some of which might reflect practices that resemble **only speech** and some that reflect practices more likely to involve conduct. Indeed, this language **must** be read to imply a difference between these three operative words. *See Lowe v*. *SEC*, 472 U.S. 181, 207 n.53 (1985) ("we **must** give effect to every word that Congress used in the statute") (emphasis added); *Scheidermann v*. *I.N.S*., 83 F.3d 1517, 1524 (3d Cir. 1996) ("it is elementary that we **must** construe a statute so as to give effect to every word.") (emphasis added). Therefore, a counselor is certainly doing something inherently different when "assessing", when "counseling", and when engaging in "psychotherapy".

If a counselor is "applying" principles in **counseling**, then the only "application" taking place is talking—i.e., speech. There is no conduct inherent in that application; it is a conversation between the client and counselor. Indeed, "counsel" means "an exchange of opinions or ideas in

order to reach a decision" or "advice or guidance, especially from a knowledgeable or experienced person." *Webster's II New College Dictionary* 263 (3d ed. 2005). The "application" here is nothing more than two people sharing thoughts and expressing opinions through their oral communications. There is nothing inherently conduct-related about that. It is speech. The application of principles and procedures in **psychotherapy**, however, may imply something more consistent with this Court's analysis. Psychotherapy is defined as the "treatment of mental and emotional disorders with psychological techniques." *Id*. at 914. While this may involve some form of communicative elements and speech, it can also include other techniques more akin to pure conduct—e.g., prescribing medications, hypnosis, etc. Nevertheless, the statute must be read as making a distinction between the application of principles in **counseling** and the application of principles in **psychotherapy**. One involves only talking, and the other involves things appropriately understood as having some components of conduct. Because Plaintiffs are only receiving counseling that is solely talking, their counselor is simply applying the principles and procedures of **counseling**. (Dkt. 4-2, Declaration of John Doe, "John Doe Decl." ¶ 13) ("The only thing we ever did in my counseling sessions was **talk** about my feelings, anxieties, and confusion that resulted from the unwanted same-sex attractions that I was struggling with and wanted to resolve.") (emphasis added).

Because A3371 regulates the speech of both Plaintiffs and their counselors, it implicates the counselors' First Amendment rights and therefore Plaintiffs' First Amendment rights to receive information. It also requires that A3371 survive more than just rational basis review and that it receive the First Amendment's most exacting scrutiny on viewpoint and content-based discrimination. A3371 cannot withstand such scrutiny.

    **2.**        **A3371 unconstitutionally discriminates on the basis of viewpoint.**

Defendants do not even address Plaintiffs' viewpoint discrimination claims because of their erroneous assumption that A3371 is subject only to rational basis review. Nevertheless, as demonstrated above, A3371 is not a mere regulation of conduct, but instead directly impacts speech. Therefore, it is subject to the First Amendment's prohibition on viewpoint discrimination. Every court that has considered a viewpoint-based restriction on private speech has invalidated it. Indeed, viewpoint-based regulations are always unconstitutional. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'" (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

A3371 prohibits the **counseling** of licensed mental health professionals in New Jersey, but only when such counseling is directed at the client's right to receive information and right to self-determination focused on changing one's sexual orientation (unless it is changing one's sexual orientation to conform to her choice of gender identity). If the client wants to change, reduce, eliminate, or resolve their unwanted same-sex attractions, behaviors, or identity (hereinafter "SSA"), then A3371 prohibits the counselor from counseling the client toward that goal (unless that goal is to change one's gender). Under A3371, Plaintiffs and other minors may receive information and counseling directing them toward or encouraging SSA, to "provide acceptance, support, and understanding," to counsel minors to transition from one gender to another, or to remain neutral. Nevertheless, they have no professional avenue to seek counseling on the possibility of changing unwanted SSA – even when that is precisely what that minor desperately wants. The viewpoint of those licensed counselors whose professional judgment leads them to believe that homosexual desires or behavior are destructive to some of their minor

clients with unwanted SSA or that their clients might be better served by choosing SOCE is silenced and censored. As such, A3371 is unconstitutional as a viewpoint-based restriction on speech. Plaintiffs hereby incorporate by reference the viewpoint discrimination section on pp. 8-15 of their original memorandum (Dkt. 4-9) as if fully set forth herein.

### 3. A3371 is subject to strict scrutiny as a content-based restriction on speech.

Because A3371 is properly understood as a regulation of speech rather than conduct, it must satisfy strict scrutiny as a content-based restriction on SOCE counselors' speech and on Plaintiffs' right to receive information. Besides its underlying conclusion that SOCE is conduct rather than speech, this Court also found that A3371 should not be analyzed as a content-based restriction because of the implications that would have for all regulations of professionals. *See King*, 2013 WL 5970343 at *15. Indeed, this Court assumed that if A3371 is subject to heightened First Amendment scrutiny, then all forms of mental health regulations would be subject to heightened constitutional scrutiny. *Id*. Defendants also mistakenly rely on this flawed premise to argue that A3371 is only subject to rational basis review. (Def. Response at 13-16). This rationale ignores the underlying premise of Plaintiffs' arguments here.

It is **not** that **all** regulations involving any element of speech whatsoever will automatically be subject to heightened First Amendment scrutiny. In fact, "[s]uch a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and with [Supreme Court] jurisprudence." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992). A3371 is subject to heightened scrutiny not merely because it involves speech, but because it prohibits certain content of a topic otherwise permissible under the law. Content-neutral regulations of the medical and mental health professions are subject to rational basis review. It is only when, as A3371 does here, the government regulates speech based on its content and

prohibits discussion of only certain content, namely SOCE that does not involve a "transition" to a different gender identity, of an otherwise permissible topic that the regulation is subject to heightened scrutiny. "Regulations that permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (quoting *Reagan v. Time, Inc.*, 468 U.S. 641, 648-49 (1984)). Regulations such as A3371 are presumptively invalid because "the government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace." *Id.* Regulations that do not pose such a threat to protected liberties, including professional regulations, will not be subject to heightened scrutiny, and Plaintiffs arguments do not raise that possibility.

Nevertheless, because A3371 does regulate Plaintiffs' ability to receive information and their counselor's ability to provide information based solely on the content of its message, it is subject to strict scrutiny and therefore must be "justified by a compelling government interest" and "narrowly drawn to serve that interest." *Brown v. Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011). A3371 is neither and cannot withstand scrutiny.

### a.      A3371 is not justified by a compelling interest.

The Legislature premised A3371 entirely on an alleged "consensus" among mental health professionals that SOCE is harmful, pointing primarily to the 2009 Task Force Report of the American Psychological Association (APA Report)[4] and on *policy* statements of various mental health organizations, which are not supported by studies but are political stances, none of which prohibit SOCE.

---

[4] Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (2009), *available at* http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf.

"The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 819 (2000). When the government seeks to restrict speech, "[i]t must demonstrate that the recited harms are **real, not merely conjectural**." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (emphasis added). This is especially true when the State's own sources admit there is no concrete evidence of harm caused by SOCE. APA Report at 91, 42. "[F]reedom of speech . . . may not be infringed on such slender grounds. They are susceptible of restriction **only to prevent grave and immediate danger** to interests which the state may lawfully protect." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943) (emphasis added).

The APA Report found "some evidence" of both alleged harm **and benefits** produced by SOCE. APA Report at 2-3, 42, 49. Notably, "sexual minority adolescents are underrepresented in research on evidence-based approaches, and sexual orientation issues in **children are virtually unexamined**." *Id.* at 91 (emphasis added). The APA Report concluded "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes** . . . because no study to date of scientific rigor has been explicitly designed to do so." *Id.* at 42 (emphasis added). The only "evidence" of harm was anecdotal – "some individuals reported being harmed by SOCE." *Id.* at 120. This will not suffice as a justification to ban speech, as "the government must present more than anecdote and supposition" to support its burden of proof. *Playboy Entm't*, 529 U.S. at 822.

Also, the assertions about a "consensus" ignore the American Association of Christian Counselors, a large mental health professional organization with 50,000 members.[5] The only justification for calling AACC members out of the mainstream is disagreement with their views,

---

[5] *See* American Association of Christian Counselors (Dec. 10, 2013), http://www.aacc.net/about-us/.

and an ideological opposition to their position. The First Amendment, however, does not depend on a show of hands. Indeed,

> [t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of a political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to **free speech**, a free press, freedom of worship and assembly, and other fundamental rights **may not be submitted to vote; they depend on the outcome of no elections**.

*Barnette*, 319 U.S. at 638 (emphasis added). A3371 infringes the Plaintiffs' constitutionally protected rights. The State does not have a compelling reason to restrict the content of speech a counselor speaks or a client seeks to hear. Plaintiffs hereby incorporate by reference the compelling interest section on pp. 16-20 of their original memorandum (Dkt. 4-9) as if fully set forth herein.

### b. A3371 is not narrowly tailored.

Even if Defendants could somehow demonstrate that A3371's viewpoint and content-based restriction on speech was justified by a compelling interest, which they have not and cannot, the preliminary injunction should still issue because A3371 is not narrowly tailored. "The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute, casting considerable doubt on the government's protestations that the 'asserted justification is in fact an accurate description of the purpose and effect of the law." *R.A.V.*, 505 U.S. at 395. The requirement of narrow tailoring is satisfied only if the restriction on speech or on the right to receive information is drawn so that it "curtail[s] no more speech than necessary to accomplish its purpose." *Johnson v. City & Cnty. of Philadelphia*, 665 F.3d 486, 493 (3d Cir. 2011) (quoting *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 811 (1984)). This certainly cannot be said of A3371, as it is a complete prohibition on any counseling that seeks to reduce or eliminate unwanted same-sex attractions, behaviors, or

10

identity (unless it is undertaken to assist in changing the client's gender) even if the client desires that counseling and is significantly benefitting from it. Total prohibitions on constitutionally protected speech are "hardly an exercise of narrow tailoring." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Such extreme measures are invalid and should be enjoined. Plaintiffs hereby incorporate by reference the narrowly tailored section on pp. 20-22 of their original memorandum as if fully set forth herein.

**4.    Even if A3371 regulates conduct, it is subject to intermediate scrutiny under *United States v. O'Brien*, which it cannot survive.**

"'[C]onduct that is intended to be communicative and that, in context, would reasonably be understood by the viewer to be communicative' is 'symbolic expression,' otherwise known as expressive conduct." *Bartnicki v. Vopper*, 220 F.3d 109, 120 (3d Cir. 1999) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)). In *King*, this Court reasoned that because the client has the goal of reducing or eliminating his or her unwanted same-sex attractions, SOCE is not intending to communicate any message whatsoever. *King*, 2013 WL 5970343 at *18. This rationale is unjustified, however, because it asks the wrong questions to determine whether something is communicative. Merely because the client seeks counseling for a specific goal does not mean that the conversation that takes place in such counseling does not communicate a message. This rationale also ignores the Third Circuit's understanding of conduct sufficiently imbued with communicative elements to warrant heightened scrutiny. Even if the client's goal in seeking SOCE counseling is change, that is not dispositive of whether the person providing the counseling intends to convey a message by providing such counseling. Indeed, "**functionality and expression are not mutually exclusive . . . things ordinarily used for functional purposes can be used for communicative purposes as well**." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 163 (3d Cir. 2002) (emphasis added).

Assuming this Court was correct that most clients seek counseling without any consideration of the viewpoint of the counselor (which the evidence shows is not true), that still does not negate the fact that SOCE counselors provide such counseling to convey a message that change is possible and that it can be beneficial to the client when they desire such change. (Dkt. 4-5, Declaration of Ronald Newman, "Newman Decl." ¶ 4) ("**Many of my clients come to me because of my Christian identity and their trust that their Christian values and beliefs will be respected in treatment**.") (emphasis added); (*id*.) ("I have a Biblical worldview, and for those clients who seek counseling from a Christian perspective and desire to conform their counseling goals with their sincerely held religious beliefs, I focus on Biblical integration in the counseling relationships which I form with them."). Many SOCE counselors are specifically sought out because of the message that is espoused in their counseling. (*Id*. ¶ 5) ("As is true with much of my practice, the individuals who seek SOCE counseling from me do so because they have a desire to conform their attractions, behavior, and identity to their sincerely held religious beliefs. Many of these individuals seek to reduce or eliminate their unwanted same-sex attractions because their religious beliefs inform them that change is possible. I also believe that change is possible."). It is beyond peradventure that those counselors are offering such counseling because they intend to communicate the message that change is possible and that a client seeks such counseling because of that message. As the Third Circuit recognized, this is no less true merely because there is a functional component to the expressive communication that takes place during that counseling.

Defendants likewise rest their entire premise that SOCE counseling is not expressive on the mere fact that there is a functional component to an otherwise expressive communication. (Def. Response at 18). Defendants' discussion is also fundamentally misguided, as they

reference Dr. Newman's specific belief that change is possible but nevertheless conclude that he does not intend in any way to convey that message when he offers the counseling. If a counselor specifically believes in the course of counseling and offers it because of his belief in its message, then it cannot be gainsaid that he seeks to communicate that belief and message when offering the very counseling conveying the message. "Context is crucial to evaluating an expressive conduct claim because 'the context may give meaning to the symbol' or act in question." *Tenafly*, 309 F.3d at 158 (quoting *Spence v. Washington*, 418 U.S. 405, 410 (2002)). Here, the context overwhelmingly supports the notion that clients are seeking this counseling because of the message it conveys and counselors are offering the counseling because of their belief in its message. That context shows that there is an inherently communicative element to a counselor doing nothing more than speaking to a client to express the message that change is possible. The relevant questions concerning the communicative element reveal why this context is crucial.

In determining whether conduct is sufficiently imbued with communicative elements, the Third Circuit has analyzed two questions. "First, we examined whether the [counselor] intended subjectively (*i.e.*, actually intended) for his conduct to communicate to persons whom he expected to observe it (*i.e.*, his intended audience) . . . Second, we considered whether observers understood the message the [counselor] intended to convey." *Tenafly*, 309 F.3d at 161. Put another way, "[c]onduct is sufficiently imbued with elements of communication if there is 'an intent to convey a particularized message' and if in the surrounding circumstances 'the likelihood was great that the message would be understood by those who viewed it." *Wilson v. N.J. State Police*, No. 04-1523 (MLC), 2006 WL 2358349, *6 (D.N.J. Aug. 15, 2006) (quoting *Tenafly*, 309 F.3d at 158). Nevertheless, "[t]he Supreme Court has relaxed its requirement of 'particularized message.'" *Cunningham v. New Jersey*, 452 F. Supp. 2d 591, 595 (D.N.J. 2006).

Indeed, "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message . . . would never reach the unquestionably shielded paintings of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." *Hurley v. Irish-American Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (citations omitted); *see also Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) ("nude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so"). Under this Court's rationale, nude dancing in a strip club is entitled to greater protection under the First Amendment than a licensed mental health professional's counseling on SOCE, even though that counseling involves nothing more than speaking to the client.

Here, while a particularized message is not a precondition to constitutional protection, SOCE counselors undoubtedly satisfy that requirement. It is clear that those counselors subjectively intend to convey the message that change is possible. (Newman Decl. ¶ 4) ("I have a Biblical worldview, and for those clients who seek counseling from a Christian perspective and desire to conform their counseling goals with their sincerely held religious beliefs, I focus on Biblical integration in the counseling relationships which I form with them."); (*id.* ¶ 5) ("I also believe that change is possible."). It is also clear that many of those clients who seek SOCE counseling do so because of the message communicated in that counseling. (*Id.* ¶ 4) ("Some of my clients actually travel considerable distances to receive the type of counseling that I offer, including some who drive over an hour and a half one way to attend counseling sessions **from the perspective that I offer** and the expertise I incorporate into their counseling.") (emphasis added); (*id.* ¶ 5) ("As is true with much of my practice, the individuals who seek SOCE

14

counseling from me do so because they have a desire to conform their attractions, behavior, and identity to their sincerely held religious beliefs.").

Given that many clients seek SOCE counseling for its message and have benefitted greatly from it, there is little doubt that the intended audience of the counselors' message (the clients) understands the message they are intending to communicate. (John Doe Decl. ¶ 13) ("The discussions that my counselor and I engage in during counseling sessions are really helpful, and sometimes just talking about it makes all the difference in the world to me. The only thing we ever did in my counseling sessions was talk about my feelings, anxieties, and confusion that resulted from the unwanted same-sex attractions that I was struggling with and wanted to resolve. Talking with my counselor has really made my feelings of anxiety and hopelessness go away.").

This context clearly reveals that SOCE counseling satisfies the two-part inquiry to determine whether counselors are engaging in conduct sufficiently imbued with communicative elements. As such, even if SOCE counseling is analyzed as conduct, it is expressive conduct and therefore must satisfy the heightened scrutiny under *O'Brien*. Under that standard, A3371 can survive only "if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). A3371 cannot meet that burden.

### a. A3371 does not advance an important government interest.

A3371 does not advance an important government interest. A3371 is grounded solely on political ideology. A3371 was also largely based on the APA Report, which was itself politically and ideologically biased. (Dkt. 4-7, Declaration of Christopher Rosik, "Rosik Decl." ¶ 3) ("It

appears that the APA operated with a litmus test when considering task force membership—the only views of homosexuality that were tolerated are those that uniformly endorsed same-sex behavior as a moral good. Thus from the outset of the task force, it was predetermined that conservative or religious viewpoints would only be acceptable when they fit within their pre-existing worldview."). Despite this bias, the APA Report still found that **insufficient evidence** existed to conclude SOCE was harmful to adults, and that there was **no evidence regarding minors**. APA Report at 42, 91. Indeed, the APA Report concluded that there **was** evidence to support **benefits** produced by SOCE. *Id*. at 2-3, 42, 49-50, 120.

The APA Report also acknowledged that "sexual orientation issues in children are **virtually unexamined**." *Id*. at 91 (emphasis added). This record is utterly insufficient to support a ban on SOCE generally, let alone a ban on SOCE to **minors** in particular. Plaintiffs hereby incorporate by reference their important interest section on pp. 25-26 of their original memorandum as if fully set forth herein.

### b.    A3371 is targeted at the expression of SOCE counselors.

A3371 is directly related to the opinions of a counselor concerning whether SOCE can assist a person struggling with unwanted SSA. Mental health professionals are permitted to counsel clients concerning SSA and **affirm** same, but they cannot counsel **change** for unwanted SSA – unless, of course, the change is a change in gender. The counselor is required to present only one message, namely, that SSA should not be resisted, and cannot be stopped, reduced, or otherwise managed. Moreover, by explicitly mentioning SSA and LGBT youth, A3371 clearly aims to ban **only** the message that seeks to change **non-heterosexual** sexual orientations. That this is the actual meaning of A3371 cannot be seriously doubted. A3371 is targeted at any counsel under any circumstance that seeks to change SSA (except such counsel in the context of

one seeking to change her gender). As the language of the bill makes clear, A3371's sole aim is the suppression of the message communicated in SOCE counseling with minors seeking to reduce or eliminate unwanted SSA. Indeed, the main sponsor of A3371 in the New Jersey legislature stated that he thinks SOCE is "an invidious form of child abuse" and that the State should take children away from parents who allow their children to seek SOCE counseling for their psychological distress.[6] Plaintiffs hereby incorporate by reference the express targeting section on pp. 26-27 of their original Memorandum as if fully set forth herein.

**B.    A3371 Violates Plaintiffs' Free Exercise Rights.**

A3371 is subject to strict scrutiny because, despite being facially neutral, it covertly targets religious beliefs. Additionally, A3371 substantially burdens Plaintiffs' religious beliefs by placing substantial pressure on Plaintiffs to choose between the dictates of their conscience and the requirements of the State's ideological mandate. Finally, A3371 is not neutral or generally applicable. A3371 cannot survive that scrutiny.

**1.    Facial neutrality does not protect A3371 from strict scrutiny.**

In *King*, this Court focused primarily on the fact that A3371 appears to be facially neutral concerning religious beliefs or practices. *King*, 2013 WL 5970343 at *25-26. Defendants likewise place their faith in facial neutrality to attempt to undermine Plaintiffs' free exercise claims. (Def. Response at 23). This reliance is misplaced and ignores substantial issues surrounding free exercise analysis. While A3371 may be facially neutral,

> [f]acial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. **The Clause "forbids subtle departures from neutrality"** and "covert suppression of

---

[6] *See* Chris Christie Signs Ban on Gay 'Conversion Therapy,' Politico.com (Aug. 19, 2013), *available at* www.politico.com/story/2013/08/chris-christie-gay-conversion-therapy-new-jersey 95666.html; *see also* Matt Barber, 'Gay' Lawmaker to Christians, We'll Take Your Children, OneNewsNow (Aug. 26, 2013), available at www.onenewsnow.com/perspectives/matt-barber/2013/08/26/'gay'-lawmaker-to-christians-'we'll-take-your-children' (quoting New Jersey Assemblyman Tim Eustace).

particular religious beliefs." Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of **facial** neutrality. **The Free Exercise Clause protects against governmental hostility which is masked, as well as overt**.

*Church of the Lukumi Babalu Aye, Inc*. *v*. *City of Hialeah*, 508 U.S. 520, 534 (1993) (citations omitted) (emphasis added).

The focus and aim of those who have targeted SOCE counseling because of its message and the legislature's principal reliance on those hostile to SOCE counseling for these laws reveals why facial neutrality is not dispositive of A3371's implications for the Plaintiffs' free exercise claims. **"[T]he codification of antigay attitudes on the part of powerful religious institutions invariably instills in some individuals profound discomfort with their sexual orientation**." Haldeman, D. (2004), *When sexual and religious orientation collide: Considerations for psychotherapy with conflicted gay men*, The Counseling Psychologist, 32(5), 691, 706 (emphasis added). The sentiments of Dr. Haldeman, one of GSE's declarants, are echoed by others supportive of these prohibitions. *See, e.g*., Drescher, J., "Queer Diagnoses: Parallels and Contrasts in the History of Homosexuality, Gender Variance, and the Diagnostic and Statistical Manual," Arch. Sex. Behav. (2010), 39(2):427-60 ("Some significant contrasts between reparative therapists and DSM-V Workgroup members who treat gender variant children are that **none of the latter practice from a religious orientation**, their published works do not explicitly cite religious dogma, **they do not think homosexuality is a sin** or an illness, they do not think it is wrong to be gay, they do not see a gay outcome as a treatment failure, they do not call what they do reparative therapy, and they do not reference reparative therapy literature in support of their clinical approaches.") (emphasis added); (Dkt. 17-6, Declaration of Laura Davies ¶17) ("Any efforts that suggest the patient has the "wrong" sexual orientation are inimical to this goal [of repairing self-esteem].").

As these quotations reveal, this case is more about a clash of viewpoints – of worldviews – than about any ephemeral harm from SOCE, and such a clash takes direct aim at the religious beliefs of individuals like Plaintiffs and the counselors they seek. "**[I]f the object of the law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral**." *Lukumi*, 508 U.S. at 533 (emphasis added). A closer examination of the motivations behind these laws reveals that facial neutrality in this instance is not enough to show that A3371 is not intentionally aimed at religious beliefs and practices that view homosexuality as a moral wrong and sinful.

This clash of worldviews is precisely what the religion clauses were intended to protect against. While Dr. Haldeman's observation about discomfort caused by the unaffirming attitudes of certain powerful institutions applies equally to the discomfort of religious clients and professionals caused by the overtly hostile attitudes of the State here: "[T]he codification of ~~antigay~~ **antireligious** attitudes on the part of powerful ~~religious~~ **State and professional** institutions invariably instills in some individuals profound discomfort with their ~~sexual~~ **religious** orientation." At its root, A3371 is an attack on the traditional religious teaching – shared by all the major world religions – that homosexual behavior is immoral (or "sinful"). Nevertheless, those traditional and deeply held religious convictions are protected by the First Amendment. Accordingly, 3371 is also subject to strict scrutiny under the Free Exercise Clause, which it cannot survive.

> **2.    A3371 is also subject to strict scrutiny because it places a substantial burden on Plaintiffs' religious beliefs.**

A3371 also places a substantial burden on Plaintiffs' religious beliefs. In *King*, this Court did not address the fact that A3371 places a substantial burden on religious beliefs by placing individuals who seek SOCE counseling under substantial pressure to violate their religious

beliefs or comply with the law's dictates. The Supreme Court, however, has not hesitated to invalidate laws "because of their **tendency** to inhibit constitutionally protected activity." *Sherbert v. Verner*, 374 U.S. 398, 404 n.6 (1963) (emphasis added); *Washington v. Klem*, 497 F.3d 272, 279 (3d Cir. 2007) (noting that a substantial burden can exist on religious beliefs whenever a law has a mere **tendency** to burden religious beliefs). If the **effect** of the law is to substantially burden a person's religious beliefs, then it is constitutionally invalid absent a finding that it can pass exacting scrutiny. Indeed, "**[i]t is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interest, give occasion to permissible regulation**.'" *Sherbert*, 374 U.S. at 406 (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945)) (emphasis added).

Plaintiff John Doe is prohibited from receiving counseling that is consistent with his sincerely held religious beliefs. (John Doe Decl. ¶ 9) ("I have a sincerely held religious belief and conviction that homosexuality is wrong . . . I want to resolve my sexual attractions so that I act consistently with my religious beliefs."). Plaintiff parents are prohibited from assisting their child with receiving counseling consistent with their sincerely held religious beliefs and from directing the upbringing of their children in accordance with those beliefs. (Dkt. 4-4. Declaration of Jane Doe, "Jane Doe Decl." ¶ 18) ("my husband and I also have sincerely held religious beliefs that homosexuality is a sinful and harmful lifestyle"); (*id.*) ("My husband and I also have sincerely held religious beliefs that we should provide our son with the necessary education to understand Sacred Scripture, as well as the teachings of our Catholic Church. We believe that assisting him in receiving the counseling . . . is one aspect of educating him to be able to live virtuously through the fundamental tenets of our faith.").

A3371 imposes a substantial burden on the religious beliefs of Plaintiffs because it forces them to elevate what the State has determined is an appropriate ideology over their own sincerely held religious beliefs about something as fundamental as their personal identity and the protection and upbringing of their child. This is the very essence of a substantial burden on religion. Rational basis simply will not suffice to save Defendants' unconstitutional imposition of a substantial burden on Plaintiffs' religious beliefs. The Constitution demands more, and A3371 cannot satisfy that demand.

> **3.      A3371 is subject to strict scrutiny because it is not neutral or generally applicable.**

A law that is neither neutral nor generally applicable "must be justified by a compelling government interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531-32. In *King*, this Court stated that the exemptions carved out by A3371 did not suffice to remove the law from being generally applicable.  *King*, 2013 WL 5970343 at *26. The Court's rationale for so holding ignores the plain language of the statute, which specifically provides exemptions highly instructive of A3371's lack of neutrality or general applicability. A3371 provides that "sexual orientation change efforts **does not include** counseling for a person seeking to **transition from one gender to the other**." N.J. Stat. Ann. § 45:1-55(b) (emphasis added). This Court reasoned that this was not an exemption because it was "not related to **changing** sexual orientation or gender identity, but toward assisting someone seeking to live **consistently** with his or her gender identity." *King*, 2013 WL 5970343 at *26 (emphasis added). This is simply not true.

A3371's defines SOCE counseling as the "practice of seeking to change a person's sexual orientation, including, but not limited to, efforts to **change behaviors**, **gender identity**, or **gender expressions**." N.J. Stat. Ann. § 45:1-55(b) (emphasis added). If a counselor is counseling

an individual to "transition" from one gender to the other, then he is certainly counseling the client to **change** gender behaviors, gender identity, and gender expressions. Indeed, counseling that assists a person in their change of gender is counseling seeking to change all of those things A3371 defines as prohibited practices. Moreover, counseling a person seeking to "transition" is counseling a person to change. A "transition" is an "act, process, or instance of **changing**." *Webster's II New College Dictionary* 1199 (3d ed. 2005) (emphasis added). To read this exception as not creating any exemption for conduct of a substantially similar nature to that prohibited is to ignore the plain language of the statute and the reality of what that counseling would entail. Indeed, the legislature's conscious decision to employ a different word than "change" for counseling in the context of gender identity – "transition" – is strong evidence that the legislators knew they were carving out one type of SOCE counseling for special treatment, and waned to disguise that pesky fact.

"The unequal treatment of equally detrimental behaviors [causes] the violation of the Free Exercise Clause." *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 265 (3d Cir. 2007). Here, it is certainly unequal treatment between these two types of counseling. Exempting counseling for a minor seeking to transition from one gender to the other is exempting counseling aimed at the harmful change from which the legislature purports to be protecting minors. Nevertheless, a minor who merely seeks to reduce or eliminate his unwanted SSA is prohibited because the legislature did not like the notion that anyone should want to reduce or eliminate SSA.

Moreover, even under this Court's own rationale of A3371's different treatment of counseling for a person seeking to "transition" from one gender to the other, Plaintiffs' counseling should fall squarely within that analysis for an exemption but does not. Under this

Court's reasoning, counseling for a person seeking to transition from one gender to the other is not aimed at changing that person's gender identity or sexual orientation, but is merely "assisting someone seeking to live consistently his or her gender identity." *King*, 2013 WL 5970343 at *26. However, the same could be said of Plaintiffs' counseling. (John Doe Decl. ¶ 9) ("I have a sincerely held religious belief and conviction that homosexuality is wrong. I **wanted** to address that value conflict because my same-sex attractions and gender confusion are contrary to the religious values that I hold. I **want** to live out my religious values and do **not** want to act out on same-sex attractions that violate my religious beliefs. I **want** to resolve my sexual attractions so that I act consistently with my religious beliefs. Because of this, and because I did **not** want to experience these same-sex attractions, I wanted my counselor to help me.") (emphasis added).

Plaintiff is merely seeking counseling to assist him with living consistently with his sexual orientation identity, yet A3371 is an absolute prohibition on that counseling. Given that Plaintiff did not view himself as a homosexual and did not want to experience his same-sex attractions, the SOCE counseling he sought from Dr. Newman was counseling that would have been "assisting him to live consistently with his" heterosexual "identity". That is virtually identical to this Court's rationale for why counseling for a person seeking to transition from one gender to the other is permissible and not an exception. Nevertheless, Dr. Newman would have been in violation of A3371 because such counseling would have been aimed at reducing or eliminating Plaintiffs' unwanted SSA and therefore prohibited.

This disparate treatment of virtually identical conduct undermines the purported justification for A3371 and also proves that there is an exemption by which A3371 should be subjected to heightened scrutiny. Indeed, A3371 is subject to strict scrutiny because it "burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of

conduct that is **not** religiously motivated **and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated**." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). A3371 cannot survive strict scrutiny because it is neither justified by a compelling interest nor is it narrowly tailored. Therefore, the preliminary injunction should issue.

### 4.   **A3371 fails strict scrutiny.**

#### a.   **A3371 is not justified by a compelling government interest.**

As the above discussion and Plaintiffs' original memorandum demonstrate, A3371 is not justified by a compelling government interest.[7] Here, the government "must demonstrate that **the recited harms are real, not merely conjectural**, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664 (1994) (emphasis added). Yet, "sexual orientation issues in **children are virtually unexamined**." APA Report at 91. Moreover, the evidence of harm is based on **mere anecdotes** from individuals who self report. For this reason, the APA Report noted that its conclusions were quite limited due to the fact that "there is a dearth of scientifically sound research on the safety of SOCE." *Id.* at 41. Such unsupported and anecdotal reports of harm are insufficient to establish a compelling government interest justifying infringement on Plaintiffs' rights to the free exercise of religion. The exemptions noted above also undermine any alleged governmental interest. Plaintiffs hereby incorporate by reference their compelling interest section on pp. 16-21 of their original memorandum (Dkt. 4-9) as if fully set forth herein.

#### b.   **A3371 is not narrowly tailored.**

---

[7] *See supra* Section I.A.3.a and pp. 16-20 of Plaintiffs' original memorandum.

A narrowly tailored regulation is one that achieves the government's interest "**without unnecessarily interfering with First Amendment freedoms**." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S 115, 126 (1989) (emphasis added). A complete prohibition on Plaintiffs' right to seek SOCE counseling from a licensed professional under any circumstances is not the least restrictive means. A complete ban is hardly an exercise of narrow tailoring, especially when the main source relied upon by the State (the APA Report) acknowledges there is evidence that SOCE is **beneficial** to some who seek such counsel and the only evidence of alleged harm is at best anecdotal, and it must be underscored—there is **no** research on **minors**. *See, e.g.*, APA Report at 3, 42, 49, 53. A3371 reaches more constitutionally protected activity than is necessary for its purported purpose, and therefore is not narrowly tailored. Plaintiffs hereby incorporate by reference their remaining narrowly tailored section on pp. 20-22 of their original memorandum (Dkt. 4-9) as if fully set forth herein.

**C.    A3371 Violates Plaintiffs' Parental Rights.**

"[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57 (2000). Indeed, [i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparations for obligations the state can neither supply nor hinder." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Despite these long established and firmly entrenched principles of constitutional law, Defendants still seek to prohibit Plaintiffs from making the decisions concerning their child's mental, emotional, and physical health in **only one area of counseling—SOCE**. In all other areas, Defendants concede Plaintiffs and other parents in New Jersey can choose what they deem an appropriate form of counseling for their child and that their child wants, so long as it is

outside the purview of A3371's prohibitions. When the issue involves their religious beliefs concerning homosexuality, however, Defendants storm the door to remove only one option of counseling on that issue. This alone reveals that A3371 unconstitutionally infringes Plaintiffs' parental rights, but it is not the whole story.

Defendants concede that Plaintiffs have the fundamental right to direct their child's upbringing, but then assert that "[s]tates may limit parental discretion when a child's 'physical or mental health is jeopardized.'" (Def. Response at 28). This argument, however, begins *in medias res*. The problem with this is that the beginning of the story here is dispositive of the entire question. The State's authority to limit a parent's discretion in certain instances is wholly contingent on establishing that a particular course of counseling **is harmful** to children. So, too, is Defendants' entire argument. Given that A3371 implicates the oldest of fundamental rights, Defendants must satisfy the most rigorous scrutiny to infringe on that right. Rational basis will not suffice. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) ("The [Due Process] Clause also provides heightened protections against government interference with certain fundamental rights and liberty interests."); *Deibler v. City of Rehoboth Beach*, 790 F.2d 328, 333 (3d Cir. 1986) ("**The highest level of scrutiny, that is, strict scrutiny, is employed . . . when the statute burdens personal, fundamental rights protected by the Constitution**.") (emphasis added).

Indeed, the Fourteenth Amendment "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided, **unless the infringement is narrowly tailored to serve a compelling state interest**." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (bold emphasis added). Government policies sometimes "come into conflict with the fundamental right of parents to raise and nurture their child. But **when such**

**collisions occur, the primacy of the parents' authority must be recognized and should yield only where the [government's] action is tied to a compelling interest**." *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000) (emphasis added). As the Third Circuit noted, "[s]tate deference to parental control over children is underscored by the Court's admonitions that 'the child is not a mere creature of the State.'" *Id*. at 307 (quoting *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 535 (1925)). Therefore, A3371 must satisfy strict scrutiny to justify removing Plaintiffs' fundamental parental rights in this area. A3371 cannot survive such scrutiny.

### 1.    A3371 is not justified by a compelling interest.

"The First Amendment requires a more careful assessment and characterization of an evil in order to justify a regulation as sweeping as this." *United State v. Playboy Entm't Grp.*, 529 U.S. 803, 819 (2000). When the government infringes a fundamental right, "[i]t must demonstrate that the recited harms are **real, not merely conjectural**." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (emphasis added). This is especially true when the State's own sources admit there is **no concrete evidence of harm** caused by SOCE. APA Report at 42. Fundamental liberty interests, such as parental rights, "are susceptible of restriction **only to prevent grave and immediate danger** to interests which the state may lawfully protect." *West Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 639 (1943) (emphasis added). Grave and immediate danger simply cannot be posited on the basis of inconclusive and anecdotal reports motivated by animus against not the practice of SOCE but the viewpoint of its practitioners and the religious beliefs of those who seek such counseling.

A3371 relies principally on the APA Report and on ideological statements of select mental health organizations, which are not supported by empirical studies but are **mere ideological or political stances**, none of which prohibit SOCE. Notably, virtually all of those

statements arise from the APA Report itself, which is inconclusive on the purported harm of SOCE counseling and wholly inadequate to justify the State's imposition of this unprecedented intrusion into parental rights. The APA Report, whose members were hand-picked pro-homosexual activists,[8] despite their best efforts to **discredit** SOCE found "some evidence" of **benefits** produced by SOCE. APA Report at 2-3, 42, 49-50, 120. Notably, with respect to the effects of SOCE on minors, the APA Report found that "sexual minority adolescents are underrepresented in research on evidence-based approaches, and sexual orientation issues in **children are virtually unexamined**." *Id*. at 91 (emphasis added). The APA Report concluded that "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes** . . . because **no** study to date of scientific rigor has been explicitly designed to do so." *Id*. at 42 (emphasis added). The only "evidence" of harm was anecdotal – "some individuals **reported** being harmed by SOCE." *Id*. at 120 (emphasis added). This inconclusive examination of SOCE counseling simply cannot justify A3371's expansive intrusion into fundamental liberties.

Plaintiffs hereby incorporate by reference the compelling interest section on pp. 16-21 of their original memorandum as if fully set forth herein.

### 2.      A3371 is not narrowly tailored.

"The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute, casting considerable doubt on the government's protestations that the 'asserted justification is in fact an accurate description of the purpose and effect of the law.'" *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (citations omitted). In the area of constitutionally protected expression, the State cannot "burn the house to roast the pig." *Sable*

---

[8] *See* Declaration of Dr. Rosik at ¶ 3.

*Commc'ns*, 492 U.S. at 127 (quoting *Butler v. Michigan*, 352 U.S. 380, 382 (1957)). Here, that is essentially what Defendants have done, and they have done so with unprecedented expansion. The breadth of A3371 reveals that New Jersey is doing nothing more than attempting to "prescribe what shall be orthodox," *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), by ensuring that Plaintiffs may **only** receive help from **licensed** professionals that affirms non-heterosexual sexual orientations. The Constitution does not give New Jersey that power. A3371 should therefore be enjoined.

## II.     PLAINTIFFS ARE CURRENTLY SUFFERING IRREPARABLE INJURY.

As the Supreme Court and this Circuit have plainly recognized, "[i]t is well-established that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Swartzwelder v. McNeilly*, 297 F.3d 228, 241-42 (3d Cir. 2002) (same). When, as is true here, a party has shown that a regulation has a chilling effect on constitutionally guaranteed liberties, then he has shown irreparable injury. *Hohe*, 868 F.2d at 73. It is "purposeful unconstitutional government suppression of speech which constitutes irreparable harm for preliminary injunction purposes." *Id.* (citing *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir.1984)). "Accordingly, it is the 'direct penalization, as opposed to incidental inhibition, of First Amendment rights [which] constitutes irreparable injury.'" *Id.* (citing *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir.1983)).

As the explicit language of A3371 demonstrates, the New Jersey Legislature has purposefully suppressed the speech of counselors whose clients request, consent to receiving, and have a First Amendment right to receive the message that unwanted SSA can be reduced or eliminated. N.J.S.A. §45:1-55(b). The State is directly and explicitly penalizing Plaintiffs and all

those who seek counseling consisting of the unapproved message that SSA can be reduced or eliminated (unless they do so to assist a client in changing her gender). *Id*. The legislative findings contained within A3371 demonstrate that the suppression of the message that SSA can be reduced or eliminated is not incidental to some larger purpose, but is the central tenet of the law. N.J.S.A. §45:1-54. The deliberate suppression of a particular message by licensed counselors constitutes irreparable injury that entitles Plaintiffs to an injunction. *See Hohe*, 868 F.2d at 73; *Swartzwelder*, 297 F.3d at 241-42.

A3371 is also preventing Plaintiffs from continuing to receive the counseling that has been so effective in reducing John Doe's formerly pervasive thoughts of suicide. (John Doe Decl. ¶ 10) ("The best part about the counseling is that I no longer have the feelings of hopelessness that I once had, and I never have thoughts of suicide anymore."). Despite Defendants' claims that Plaintiffs receive no injury from A3371 given that they have a counselor in New York (Def. Response at 31), this ignores the expert opinions and recommendations that Plaintiffs' mental health counselor has provided. (John Doe Decl. ¶ 14) ("My counselor told me that there are also licensed psychologists who do counseling very similar to his, but will also talk with me about some of the things that bothered me when I was younger. My counselor says that the conversations with him have really helped me, but that licensed psychologists know more about other types of counseling and that I will probably like talking to them as much as I like talking to him. I really like my counselor, but I also want to have all of the conversations and counseling necessary to help me achieve my goal of getting rid of my same-sex attractions."); (Jane Doe Decl. ¶ 15) ("Because his counseling is more prospective thinking, our counselor informed us that our son might benefit from the additional counseling of a person who engages in conversations dealing with root causes, background information, and other introspective

analysis offered in other **licensed** professional counseling. Our counselor made such a recommendation based on some of the recent discussions he has had with our son, and we want to continue to be able to make sure our son receives the best counseling from the best counselors on all aspects of those problems that cause him distress. Because of that recommendation, we contacted Dr. Ron Newman, a licensed psychologists in New Jersey, to attempt to engage one of them for our son. Because of A3371, however, there is not anyone who is able to provide such **licensed** counseling anywhere in our state.") (emphasis original). The deprivation of Plaintiffs' rights to seek and receive substantially beneficial counseling consistent with their sincerely held religious beliefs is unquestionably irreparable injury.

## III.   THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN PLAINTIFFS' FAVOR.

Because Plaintiffs are currently suffering irreparable injury and have demonstrated that A3371 is an unprecedented and unconstitutional intrusion into the counseling sessions of minors in New Jersey, enjoining its enforcement will prevent the continued deprivation of constitutional guarantees and will not cause any harm to Defendants. Defendants claim that enjoining A3371 would result in "substantial" harm to minors. (Def. Response at 32). Such a claim is wholly without merit. Indeed, as the Third Circuit has recognized, Defendants remain free to attempt to enact new regulations "that are better tailored to serve [their] interests." *Swartzwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002). They are also free to enact such regulations that espouse their ideological position that SOCE counseling should not be sought but that does not unconstitutionally infringe on the rights of Plaintiffs and others to disagree with the government and seek such counseling. Moreover, if the alleged harm from an injunction would be so substantial, as Defendants claim, it is curious why it took them since 2009 to pass a regulation they now claim is such an emergency. Their entire justification for this law is the APA Report,

issued in 2009, but it was not until four years later that such an "emergency" was addressed. Moreover, the APA Report conceded that there was **no** evidence of harm to **children**, yet the ban imposed under A3371 "protects" **only** children. This is absurd on its face. Therefore, it is Defendants' claims of harm that are "baseless" and "unfounded."

## IV.     THE INJUNCTION WILL SERVE THE PUBLIC INTEREST.

The protection of constitutional rights is of the highest public interest. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "the public interest is best served by eliminating unconstitutional restrictions." *Swartwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002). Additionally, there is simply no interest in the protection or enforcement of unconstitutional laws. *See ACLU v. Ashcroft*, 322 F.3d 244, 250 n.11 (3d Cir. 2003). "[I]t is incontrovertible that 'curtailing constitutionally protected speech will not advance the public interest.'" *Stilp v. Contino*, 743 F. Supp. 2d 460, 470 (M.D. Penn. 2010) (quoting *ACLU v. Reno*, 217 F.3d 162, 180 (3d Cir. 2000)). Here, because A3371 is unconstitutional viewpoint discrimination, violates Plaintiffs' free exercise and parental rights, and unconstitutionally chills the rights of Plaintiffs receive counseling consistent with their religious beliefs, there is no public interest in maintaining or enforcing its prohibitions. Instead, entrance of an injunction merely restores the status quo ante that has existed for decades without any evidence of harm, either to children or to adults.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and issue the preliminary injunction.

Dated: December 13, 2013

32

Respectfully submitted,

/s/ Demetrios Stratis
      Demetrios Stratis
      New Jersey Bar No. 022391991
      Mathew D. Staver*
      Stephen M. Crampton*
      Daniel J. Schmid*
      Liberty Counsel
      Attorneys for Plaintiffs
      P.O. Box 11108
      Lynchburg, VA 24502
      Tel. 434-592-7000
      Fax: 434-592-7700
      court@LC.org

* Application to appear Pro Hac Vice pending

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the court on December 13, 2013. Service will be effectuated by the Court's electronic notification system upon all counsel of record.

/s/ Demetrios Stratis
Demetrios Stratis
New Jersey Bar No. 022391991